## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CASE NO.:_____**

**MADELEINE "MADDY" WILFORD**,

      Plaintiff,

vs.

**UNITED STATES OF AMERICA**,

      Defendant.

_____/

## <u>COMPLAINT</u>

Plaintiff, Madeleine "Maddy" Wilford, sues the Defendant United States of America as follows:

## <u>NATURE OF THE ACTION</u>

1.      "I know he's going to explode," a woman who knew Nikolas Cruz said on the FBI's tip line on January 5, 2018.  Through the designated channel for the American public to convey information to the FBI, she provided detailed and specific information that Cruz "was going to slip into a school and start shooting the place up."  She explained to the FBI that Cruz wanted to kill people.  Not only had he said so, but he had the means to do so—he had spent the last several months collecting rifles and ammunition.  Forty days after the FBI got the call, Cruz did just what the tipster warned the FBI he would do.  He entered his former high school—Marjory Stoneman Douglas High School in Parkland, Florida—murdered 17 people and wounded at least 17 more.

2.      Plaintiff, Madeleine "Maddy" Wilford, was shot by Nikolas Crus while she was in her  classroom on the first floor of Building 12 at Marjory Stoneman Douglas High School.

3.     On or before February 14, 2018, the FBI knew that Nikolas Cruz had the stated desire and capability to carry out a mass school shooting.

4.     Two days after the Plaintiff was shot, the FBI issued a public written statement admitting that, on January 5, 2018, it received information "about Cruz's gun ownership, desire to kill people, erratic behavior, and disturbing social media posts, as well as the potential of him conducting a school shooting."  The FBI went on to admit that its own established "protocols were not followed" and that the information provided to the FBI on January 5, 2018, "should have been assessed as a potential threat to life" and "should have been forwarded to the FBI Miami Field Office, where appropriate investigative steps would have been taken."

5.     In the days and months since the FBI issued its initial public statement on the Parkland shooting, FBI officials repeatedly confirmed and expanded on the admissions contained therein.  On several occasions, senior officials at the FBI admitted that the bureau had made mistakes, that established protocols required the FBI to handle the information about Cruz in certain specific ways, and that the FBI failed to follow those strong processes and protocols.  At no time has the FBI ever asserted that its statements were improperly issued or that they lack authenticity or misstate the FBI's position.

6.     The FBI had non-discretionary obligations—governed by established policies, protocols, and other rules—directing how FBI employees must assess and handle tips about potential threats to life, active shooters, mass shootings, terrorism threats, and school shootings (collectively, "mandatory directives").  The FBI was required to act in accordance with these mandatory directives.  On numerous occasions, the FBI admitted that the mandatory directives existed and that they were violated.  If the mandatory directives had not been violated, the information about Cruz would have been shared with FBI agents at the FBI Miami Field Office,

who would have done an appropriate investigation and prevented or mitigated the attack that results in the injuries and damages suffered by the Plaintiff.

7.      The FBI employees who received the information about Cruz were required to act reasonably in handling the specific and detailed information they received—at a minimum, not to ignore the information entirely—and to forward the information to the FBI employees who would have conducted an appropriate investigation.  Yet, contrary to its own established rules, the FBI failed to take any action whatsoever with the information it received.  If the FBI had complied with its mandatory obligations to investigate and intervene in Cruz's plans to carry out a mass shooting at Marjory Stoneman Douglas High School, Cruz would not have succeeded in carrying out his attack and the Plaintiff would not have been shot.

8.      As a direct, proximate, and foreseeable result of the FBI's negligence, Cruz was able to kill 17 students and teachers and wound many more, including the Plaintiff.

9.      Plaintiff brings this lawsuit under the Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671-80.  Plaintiff suffered harm, including without limitation, bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical, nursing care and treatment, loss of earnings and loss of ability to earn money.  The losses are either permanent or continuing in nature and Plaintiff will suffer the losses in the future.  Plaintiff seeks recovery of the damages and any other damages recoverable under the applicable law.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

11.     Venue is properly in the Southern District of Florida pursuant to 28 U.S.C. §1391(b) because the Plaintiff's claims arose in Broward County, Florida, which is located in the Southern District of Florida.

12.     Plaintiff has complied with and exhausted all applicable pre-suit notice requirements of the Federal Tort Claims Act.  More than six months before the filing of this complaint, the FBI received the Plaintiff's Notice of Claim. The FBI did not issue a formal denial of the Plaintiff's claim within six months, and thus the claim is deemed denied.

## THE PARTIES

13.     At the time of the shooting Plaintiff was a resident of Parkland, Florida, and currently attends college in Utah.

14.     The United States of America is a defendant in this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671-80, *et seq.*, arising from the acts and/or omissions of employees and agents of the FBI, an agency of the defendant.

15.     The FBI is a federal law enforcement agency statutorily empowered by the United States Congress to enforce and investigate certain alleged violations of the United States Criminal Code. The FBI is part of the Department of Justice.

## FACTS

**I.      "If you see something, say something."**

16.     The FBI instructs the American public to report information about potential threats and crimes to it.  The FBI also induces the public to rely on the agency to respond to the tips appropriately by making specific assurances that each tip will be handled with due diligence and passed along to FBI agents who will act on the information appropriately.

A.     The FBI's creation of the Public Access Line.

17.     Prior to 2012, the FBI's local field offices received calls directly from the public. This meant that the personnel at the local offices—the agents and analysts tasked with investigative and intelligence duties—would receive and process information about potential threats themselves.

18.     In 2012, the FBI centralized how public information was gathered.  The FBI created a Public Access Line, or "PAL," as the central channel for civilians to alert the FBI about crimes and threats.  Instead of going directly to local field offices, the public tips would be routed to the PAL.  The FBI publicized that the PAL would be a central repository to receive information from the public and pass that information to FBI agents and analysts.  When the FBI set up the PAL, it announced on its website, fbi.gov, that "the FBI is implementing an easy way for the public to quickly provide tips and other information to agents and analysts."[1]  According to the FBI, the PAL would be tasked with gathering information from the public and sending that information to the investigative entity that needs to act on the information.

19.     In a podcast and article available on the FBI's website, Jeffrey Lindsey, the chief of the Public Access Line Unit of the Criminal Justice Information Services Division in November 2013, explained that the PAL "helps [the FBI] capture the information in a better way," which "helps streamline [the FBI's] investigative and analytical process."  *Id.*  Another FBI employee, Mollie Halpern, explained to the public that "Bureau employees with specific training to gather as much information as possible staff the line around the clock."  *Id.*

---

[1] https://www.fbi.gov/audio-repository/news-podcasts-thisweek-public-access-line.mp3/view.

**B.      The FBI strongly encourages the public to report information about potential threats, and it assures the public that tips will be handled and investigated with due diligence.**

20.      The FBI strongly encourages—indeed it instructs—the public to send it information about potential mass shootings, school shootings, terrorism threats, and other potential threats to life.  To give just one example, on the "Contact Us" page of the FBI's website, the FBI instructs concerned citizens to "submit a tip" to the FBI to report suspected terrorism or criminal activity. The website tells the public "If you see something, say something."[2]

21.      The FBI's "Contact Us" page asks viewers to "See What We Investigate for more information on our areas of investigative responsibility."    The blue words—"What We Investigate"—is a link to the FBI's "What We Investigate" page, which describes several categories of crime that the FBI takes primary responsibility for investigating.   The most significant category on the page is "Terrorism."   The FBI takes on the responsibility of investigating and preventing acts of terrorism—*i.e.*, terrorist acts perpetrated by individuals inspired by or associated with foreign terrorist organizations and nations or U.S.-based movements that espouse extremist ideologies of a political, religious, social, racial, or environmental nature. According to the FBI's website, "[p]rotecting the United States from terrorist attacks is the FBI's number one priority."

22.      Consistent with this mission, the FBI focuses, in part, on homegrown violent extremists who pose a threat of international terrorism—*i.e.*, those sympathizers who have been inspired by foreign terrorist organizations, are based in the U.S., have been radicalized primarily in the U.S., and are not directly collaborating with a foreign terrorist organization.  For example, at the time of the Parkland shooting, the FBI classified the perpetrators of the 2015 mass shooting

---

[2] https://www.fbi.gov/contact-us.

in San Bernardino, California, as perpetrators of international terrorism, despite the fact that the shooters were merely homegrown violent extremists who sympathized with ISIS, and were neither members of ISIS nor formally supported by ISIS.  At the time of the Parkland shooting, the FBI's website provided definitions of "International terrorism" and "Domestic terrorism," both of which were listed under the umbrella of "Terrorism"—the FBI's top investigative priority.   These definitions cited the San Bernardino shooting as the archetypal and definitional example of the term "international terrorism":



**Terrorism Definitions**

**International terrorism**: Perpetrated by individuals and/or groups inspired by or associated with designated foreign terrorist organizations or nations (state-sponsored).
--for example, the December 2, 2015 shooting in San Bernardino, CA, that killed 14 people and wounded 22 which involved a married couple who radicalized for some time prior to the attack and were inspired by multiple extremist ideologies and foreign terrorist organizations.

**Domestic terrorism**: Perpetrated by individuals and/or groups inspired by or associated with primarily U.S.-based movements that espouse extremist ideologies of a political, religious, social, racial, or environmental nature.
--for example, the June 8, 2014 Las Vegas shooting, during which two police officers inside a restaurant were killed in an ambush-style attack, which was committed by a married couple who held anti-government views and who intended to use the shooting to start a revolution.

     23.      Before the Parkland shooting, the FBI received information that Cruz sympathized with ISIS—the same foreign terrorism organization with which the San Bernardino shooters expressed sympathy. The FBI also knew Cruz had been posting messages in Arabic and had been dressing as a member of ISIS in public social media posts.

     24.      The FBI's website also explains that it is the go-to entity for concerned citizens to report a potential mass shooting. The website states that "[t]he FBI concentrates on crime problems that pose major threats in American society. Significant violent crime incidents such as mass killings, sniper murders, and serial killings can paralyze entire communities and stretch state and local law enforcement resources to their limits."

     25.      The FBI specifically encourages the public to use the PAL to report information about potential attacks and assures the public that the information will be provided to agents and analysts who will investigate the information appropriately and prevent harm.  For example, on

one page of the FBI's website, originally published in July 2015 and still available, the FBI instructs the public: "If you know of or suspect criminal behavior, the FBI wants to hear from you."[3]   In the article, the Section Chief of the FBI's Counterterrorism Division, Jane Rhodes-Wolfe, explained that "each tip is reviewed within one minute from the time it's received.  A team of special agents and analysts monitor the tips around the clock."  She went on, encouraging the public to report information to the FBI so that lives could be saved: "We know that these are hard items to report to us, *but you really have the potential to save someone—to save someone from potentially causing harm to others or causing harm to themselves*."  *Id.* (emphasis added).

26.     On yet another page on the FBI's website, originally published in July 2011 and still available, the FBI tells the public: "If you have knowledge of suspected terrorism of criminal activity, the FBI wants to hear from you."[4]   The webpage assures the public that the FBI will review everything that it receives within six minutes and share the information with the appropriate FBI divisions for follow-up investigation.

27.     In another article originally published in November 2013 and still available, the FBI states: "The Navy Yard shootings in Washington, DC.  The Boston Marathon bombings. . . . These are major cases and catastrophic events when the FBI wants to hear from you."[5]   In the same article, Mr. Lindsey explained: "When a member of the public calls . . . *they can rest assured* that on the other end is going to be an FBI employee who's fully trained and experienced in taking calls from the public, making sure that information gets handled in a confidential manner, and *gets sent to the investigative or analytical entity that needs that information*."  *Id.* (emphasis added).

---

[3] https://www.fbi.gov/audio-repository/news-podcasts-thisweek-online-tips-to-the-fbi.mp3/view.
[4] https://www.fbi.gov/audio-repository/news-podcasts-thisweek-internet-tip-line.mp3/view.
[5] https://www.fbi.gov/audio-repository/news-podcasts-thisweek-public-access-line.mp3/view.

28. On several pages of its website, all published before the Parkland shooting, the FBI assures the public that every piece of information the public submits to the PAL is given the appropriate level of due diligence. For example, on another website page about the FBI's tip line, Special Agent Eric Reese, the Watch Commander of the FBI's Public Access Center Unit, explains to the public: "I think one of the most important things to know about the FBI's tip line . . . is every single piece of information that's submitted by an individual is reviewed by FBI personnel at FBI Headquarters. ***So there's nothing that goes unaddressed. We basically listen to everything that people want to submit and we give it its due diligence***."[6]

29. Several pages on the FBI's website explain that tips are analyzed quickly and then disseminated to field offices, where agents can take appropriate investigative steps. On one FBI website page, the Assistant Section Chief of the Counterterrorism Division, Stephen Woolery, explained: "***We cannot afford to let one tip fall through the cracks, so we analyze every tip, we process it as quickly as we can, and we get it out to the appropriate FBI elements***."[7] According to the article, "Supervisory Special Agent Matthew Bertron says this is an essential function within the Bureau." *Id.*

30. On another website page, Special Agent Reese, the Watch Commander of the FBI's Public Access Line Unit, explained that "every single tip is looked at by at least two individuals who have independent quality assurance checks. And then once a tip is determined to have further investigative merit a supervisor would actually review the tip, and it would be formatted into electronic communication or entered into eGuardian for further entry into the Guardian system and follow onto the Automated Case Support System. So there's a third level at which point it's

---

[6] https://www.fbi.gov/video-repository/newss-inside-the-fbis-internet-tip-line/view. (emphasis added).

[7] https://www.fbi.gov/audio-repository/news-podcasts-thisweek-internet-tip-line.mp3/view.

leaving FBI Headquarters to go out to the field."[8]  The same website page quoted a lead customer service representative with the Public Access Line unit, who explained "[t]he access line is on the front line serving a very important role for the Bureau.  We're building those initial relationships with the public so information can get out into the field in a timely manner."  *Id*.

II.   **"I'm going to be a professional school shooter."**

31.   Five months before the shooting, the FBI learned that Cruz had professed his intention to become a school shooter.

32.   On September 24, 2017, a Mississippi bail bondsman named Ben Bennight received a comment on his YouTube channel from Cruz.  In the post, Cruz said he was "going to be a professional school shooter":



33.   Cruz made no attempt to conceal his identity.  He used his first and last name, rather than a unique username, in the post.

34.   Bennight immediately reported Cruz's threatening comment to the FBI.  The FBI entered the tip into the Guardian system and assigned the lead to FBI agents at a local field office. The Guardian system, among other things, allows information about threats to be tracked, managed, and analyzed.

35.   The next day, two FBI agents interviewed Bennight about the comment.

36.   Upon information and belief, the FBI closed its file on this matter in October 2017.

[8] https://www.fbi.gov/video-repository/newss-inside-the-fbis-internet-tip-line/view.

### III.   "He's going to explode."

37.     A little more than one month before the shooting, the FBI received another tip warning that Cruz would commit a school shooting.

38.     On January 5, 2018, a person close to Cruz contacted the FBI's Public Access Line to report her concerns about Cruz's behavior.  The January 5 caller provided detailed information about Cruz's desire to kill people, his erratic behavior, his history of violence, his disturbing social media posts, his fixation with ISIS, the potential of him conducting a school shooting, and his increasing obsession with amassing guns, including assault-style rifles.

#### A.     Cruz said he wanted to kill people.

39.     The January 5 caller warned that Cruz was 18 years old but had "the mental capacity of a 12 to a 14-year-old."  She explained that Cruz's mother had just recently died, and Cruz had been exhibiting violent and suicidal behavior since his mother's death.

40.     The caller explained that, since his mother's death, Cruz had "started off saying he wanted to kill himself."  In response, the caller had called the Parkland Police Department and spoke to an officer there about Cruz's behavior, but she did not hear anything back.  Then, the caller explained, "just recently," Cruz "switched it to he wants to kill people."  In other words, since the time the caller had last contacted the Parkland Police Department, Cruz had begun professing a desire to kill other people.  This new threat—a threat that Cruz would kill others— prompted the January 5 caller to contact the FBI.

41.     The caller explained that Cruz had said he wanted to kill people in a public post on his Instagram, but about two days later, he took the post down:[9]

---

[9] The quoted language is from the transcript of the tipster's call to the FBI on January 5, 2018.

> His mother just passed away on the first of
> November. He's got Instagram accounts. He started off saying he wanted to kill
> himself. So what I did was I called the Parkland, which is where he lives. Uh,
> Parkland Police Department and I spoke to a officer▢[PH], uh,▢[PH].
> Um, I didn't hear anything on, you know, my—I left it. I gave him all the
> information I had. And then just recently, now he has switched it to he wants to
> kill people. And then he put that on his Instagram and about two days later, he
> took it off.

**B.    Cruz was inspired by ISIS, he dressed in ISIS garb, and he used Arabic expressions to convey his violent ideations on social media.**

42.    The January 5 caller said that Cruz was "so into ISIS" and that she was "afraid this is so- something's gonna happen."

> Um, if you go onto his Instagram pages, you'll see all the guns he-he's
> so into ISIS and, um, I-I'm afraid this is, so-something's gonna happen. Because
> he's, he doesn't have the mental capacity. He can't, he's so outraged if someone
> talks to him about certain things. And he had pulled a rifle on his mother before

43.    In addition, the caller said that Cruz had expressed and exhibited a fixation with ISIS, even dressing up as a member of ISIS and posting messages in Arabic that appeared to threaten that he would do something violent.

> And then, uh, you know, wanting to kill all these animals and uh, he wants to um,
> uh, do something in Arabic and uh, he-he dresses up like a ninja or a, or a-a-a
> ISIS guy. And he has pictures of all the rifles and everything on the Instagram, on
> one of these accounts.

**C.    Cruz had been amassing a collection of guns in the months before the tip call, and the January 5 caller expected him to commit a mass shooting.**

44.    The January 5 caller told the FBI that she was even more concerned about Cruz's propensity for violence because he had been acquiring guns, including rifles, since his mother's death. Before his mother died, Cruz had "pulled a rifle on his mother." Then, after his mother's death, Cruz took money out of his mother's account and "brought all these rifles and ammunition and he posted pictures of them on the Instagram."

> And he had pulled a rifle on his mother before
> she had, uh, passed away because she wanted to get money to [UI]. Um, and the
> whole, and another problem is that—and-and he's 18 and his mother's life
> insurance policy is, uh, coming in and he is going to receive $25,000 from that
> and then at 21, uh, 24, and up to 30, he's receiving, uh, $25,000 every year after
> that, uh, from a, um, a wrongful death suit that the mother had on the father, on
> his father. So, he went out and he, um, took money out of his mother's account. I
> don't know how he got the debit card, but he did. And he, uh, took money. This is
> after she passed away. And he took the money out, the social security money out.
> And he took it, and he bought all these rifles and ammunition and he posted
> pictures of them on the Instagram.

45.     The caller explained that she and another cousin of Cruz's had grown very

concerned about Cruz, and she wanted the FBI to know so that they could look into it.  The caller

expressly stated that Cruz might "take[] off and . . . start shooting places up."

> And the family that, you know, distant cousin
> and-and myself, um, are very concerned about this because I just want someone to
> know about this so they can look into it. If they think it's something worth going
> into, fine. If not, um, I just know I have a clear conscience if he takes off and, and
> just starts shooting places up.

46.     The caller described in detail various posts on Cruz's Instagram account that

displayed his weapons, including guns, knives, and ammunition.  The caller said the Instagram

page contained a photo of "a whole bag with all kinds of rifles" and "scopes."  She explained that

Cruz was expecting to receive thousands of dollars from his mother's estate, and he would use that

money to buy more guns.

See, if you go on that, it'll show you all these pictures of him dressed up in, he-he-he wants to be a, he also wants to join the Army so [UI]. He shows the gun that he purchased. The Maverick, uh, 88 Slug. He paid $219 for it. Um, and he shows you all the, uh, knives that he's got and the gun. And he does hold up one gun. And I noticed at the end of the one gun it has an orange tip. And that's just to let the police know it's not real. I believe. And, um, he does use that. It's like an air, air pistol. Um, but, you know, and then the other one is where he's um, cutting up frogs and, uh, and he shows his guns also. Uh, where is it? Okay, the, uh, Nikolas Cruz M-A-K-A-R-O-V. In that one there, he's . . . tell you how confused he is he's got the Make America Great Again hat on. And his face is all covered with a scarf. And it shows you a dirt road. It shows you the frogs. They're a little bloody. The American eagle, uh, ammunition. What looks to be a something that you shoot at, it's in a frame. His rifle, and then a whole bag with all kinds of rifles and-and stuff on it. And scopes. I mean he-he . . . and . . . [UI] the main concern is also when he gets this $25,000. He's not going to give it to this man to invest. He's going to buy guns.

**D.    Cruz's social media accounts contained statements of his desire to kill people, his steps taken toward that goal, and other violent images.**

47.    The caller gave specific information about Cruz's social media accounts, which contained Cruz's credible statements and other evidence of his desire and planning to kill people, and photos of Cruz's weapons including "all kinds of rifles." The caller urged the FBI to go onto Cruz's Instagram page, where Cruz had posted about his desire to kill people.

> Uh, on the Instagram, he says, "I want to kill people." Um. Yeah, let me see. [UI] uh, yes, "I want to kill people." And, um, I can, give you, the Instagram accounts and you can look at them and you'll see the pictures.

48.    The caller gave the FBI specific details about Cruz's Instagram accounts, spelling out, letter-by-letter, the handles Cruz used on Instagram so that the FBI could verify the information for itself.

> Okay. The one account where it was on there, "I want to kill people," and then he took it down is Nikolas, N-I-K-O-L-A-S underline Cruz, C-R-U-Z underline. Now there's another, um, that you should really look at and that's Nikolas. Oh this is all one word all, uh, underca-lowercase. N-I-K-O-L-A-S-C-R-U-Z-M-A-K-A-R-O-V.

49.    The caller also explained that Cruz's Instagram accounts contained photos of animals Cruz had mutilated and killed, and she provided the FBI with additional details about

Cruz's mutilation of animals.  She told the FBI that Cruz's interest in killing animals, cutting them up, and posting photos of them was "a red flag."

> Okay. And then there's an-there's another one, um, uh, it-it's Cruz, C-R-U-Z, underline, Nikolas, N-I-K-O-L-A-S. Um, and that's where all [UI]. And, now, it-it's cutting up animals and things like that. Little animals. Right now it's just frogs and I know for a fact it was a bird at one time. Uh, just to, just to give you a little background on him. You know how a bird will fly around in the backyard and then hit your glass door, your sliding glass doors and hit the ground?
>
> Mhm.
>
> Well that's what happened. He brought the bird into the house. He threw it on his mother's kitchen counter and he started cutting it up. He has all kinds of hunting knives. I don't know what knife he used though. And he started cutting the, uh, bird up and his mother, Linda [PH], said, "What're you doing?" And he says, "I want to see what's inside." Now . . . I don't know. [chuckle] That to me would be a red flag.

### E.     Cruz was going to shoot up a school.

50.     Over and over again, the caller stressed the danger of Cruz's access to guns combined with his erratic behavior and propensity to act violently.  The caller said with certainty that she *knew* Cruz was "going to explode."

> You know, it-it's just, it's so much and I know he's-he's going to explode. A man he befriended, some young boy who's also on Instagram, and, um, his father, this boy's father took him in. Him and his wife took Nikolas in and said he could live there and, uh, his guns and everything could be in the house because he has them locked up.

51.     The caller was specific about the way she expected Cruz to explode—he was going to shoot up a school.

52.     The caller said she felt compelled to call because "it's alarming to see these pictures and to know what [Cruz is] capable of doing and-and what could happen." She explained that he had exhibited violent and erratic behavior in the past, including picking up a chair and throwing it at someone—a student or a teacher at Marjory Stoneman Douglas High School—because he didn't like the way they were talking to him. The caller explained that Cruz had been kicked out of school

for his violent behavior, and she specifically said Cruz was going to get into a school and shoot the place up.

> And, um, I don't know. It-it just . . . it's alarming to see these pictures and to know what he's capable of doing and-and what could happen. He's not in school any longer. He never graduated high school. He's thrown out of all these schools because he would pick up a chair and just throw it at somebody, a teacher or a student because he didn't like the way they were talking to him. Um, I-I just think about, you know, getting into a school and just shooting the place up.

**F.      The January 5 caller relied on the FBI.**

53.     The January 5 caller gave the FBI customer service representative the name and phone number of the individuals who Cruz was living with, and she provided the address of the home where Cruz was living at the time.    FBI agents never called the number, nor did they visit the home.

54.     The January 5 caller also gave the FBI customer service representative her own phone number and information so that she could be reached and provide any other information the FBI might have needed in its investigation.  She was never contacted again.

55.     The January 5 caller ended the call by telling the FBI that she needed to report the information to the FBI so that it could investigate because, she said, "I do believe something's going to happen."

> Okay. Very good. Um, I didn't know whether to call you or Homeland Security or who, but, like I said. Um, when you look into this, you can make the decision as to whether you want to go further or not. I just want to, you know, get it off my chest in case something does happen and I do believe something's going to happen, but . . .

56.     The FBI's customer service representative assured the tipster that the FBI, and not some other governmental body, was the proper forum for reporting school shooting threats.  On the call, the tipster expressed some ambivalence about whether she was calling the correct governmental agency, saying, for example, that she "didn't know whether to call you or Homeland

Security or who," and the FBI intake specialist responded by assuring the caller that the FBI appreciated that the tipster had chosen to call. The FBI customer service representative did not direct the caller to report her observations and concerns to anyone else. Nor did the FBI alert the January 5 caller that she could or should take other precautionary measures to prevent the attack the caller knew would happen if someone did not intervene. The FBI assured the January 5 caller that she had reported the information to the right place. The January 5 caller was made to believe she could rest assured that the FBI would handle the information she provided with due diligence.

57.      The January 5 caller relied on the FBI to investigate the matter and decide the best course of action. She believed that if she gave the information about Cruz to the FBI, it would use due diligence to investigate the tip appropriately. Because she relied on the FBI to handle the tip with reasonable care, she forewent other potential remedies and precautions. For example, she did not contact other law enforcement agencies or Marjory Stoneman Douglas High School to tell them about Cruz's violent plans and efforts to carry them out because she relied on the FBI's undertaking to handle the information appropriately. If the FBI had not undertaken the task of collecting information of this sort and handling it appropriately, the caller would have taken other measures to ensure that Cruz was prevented from carrying out an attack. In short, having been assured that she had provided the information to the right entity and that the FBI would handle her tip with due diligence, the caller took no further action concerning the threat posed by Cruz.

58.      The January 5 caller expected the FBI would look into the issue further, explaining "I just want someone to know about this so they can look into it" and "when you look into this, you can make the decision as to whether you want to go further or not." On several occasions, the tipster also explained that by coming to the FBI, she was giving over the responsibility of handling the information to the FBI. She said, "If they think it's something worth going into, fine. If not,

um, I just know I have a clear conscience if he takes off and, and just starts shooting places up." She also said she was getting the information "off [her] chest in case something does happen and I do believe something's going to happen."

59.     The FBI customer service representative asked the caller "So if anybody else has questions they can call you back. Is that correct, ma'am?" The caller replied "Yes, you can, hun." The FBI intake specialist also sought specific details on Cruz's whereabouts, including his current address and phone number.  The January 5 caller understood that these questions were meant to compile all the information that would be passed along to agents or analysts who would give the information its due diligence and take appropriate investigative steps.

60.     The January 5 caller wanted to be sure that her detailed and urgent information about Cruz's desire and steps toward an attack would be properly investigated.  When the January 5 caller was preparing to end the call, she expressly reconfirmed that the FBI would look into the information she provided.  The tipster would not have obtained the peace of mind she was looking for—and she *would have* sought assistance elsewhere—unless she felt confident that the FBI would look into the information she gave it.  The January 5 caller stated, "Um, *when you look into this*, you can make the decision as to whether you want to go further or not . . . and I do believe something is going to happen . . . ."  In response, the customer service representative said, "I do appreciate you calling that in, ma'am."

61.     The tipster surmised from the phone call that that the FBI would "look into" the information she gave it, meaning that the agency would pass the information along to FBI agents or analysts with the experience and expertise to conduct at least some investigative steps, enough steps to either neutralize the threat posed by Cruz or conclude that it did not merit further action. The FBI's responses to the tipster had the effect of assuring her that the FBI would take the

appropriate investigative action—at the very least, look into the threat and potentially follow-up with her.

**G.    The FBI failed to act reasonably—and it failed to follow protocol—in handling the information it received about Cruz on the January 5 call.**

62.    The FBI did not take appropriate investigative steps in response to the call.  The FBI did not create a Guardian for the information provided by the January 5 caller; it did not forward the information to the local FBI Field Office in Miami, Florida where additional investigative steps would have been taken; the FBI did not pass the information along to local law enforcement in Parkland, Florida; and the FBI did not pass the information along to Cruz's target— Marjory Stoneman Douglas High School—so that the school could take appropriate measures to prevent the massacre.  These failures violated the FBI's own mandatory directives.  Indeed, as explained below, the FBI *admitted* that it failed to follow its own established protocols.

**IV.    "I whana shoot people with my AR-15."**

63.    For years before the shooting at Marjory Stoneman Douglas High School, Cruz was using social media to post messages and pictures of himself describing his violent desires and intentions.  The FBI would have been able to view these social media posts and open source public pages if it had followed up on the information the January 5 tipster gave it.  The social media posts also would have corroborated the veracity of the January 5 caller's information.

64.    If the FBI had followed up on the information it received from the January 5 caller it would have seen Cruz's social media posts, which depict Cruz posing with weapons, including guns and knives, on Instagram:



65.    In many of the photographs loaded onto Instagram, Cruz covered his face with masks or bandanas while he brandished weapons.





66.     Cruz's obsession with amassing high-powered weapons was apparent from his social media.  He used social media to post advertisements for weapons he wanted to buy. In one instance, Cruz posted an advertisement for the Maverick 88 Slug on Instagram.  In the post, Cruz asked his Instagram followers for advice about gun costs and passing background checks:



67.     Throughout the rest of 2017, Cruz continued to post photos displaying his growing collection of weapons and ammunition, including the AR-15 that Cruz eventually used in the shooting.  In one photograph, Cruz called his collection an "arsenal":







68.    In another post, Cruz uploaded a photograph showing that he was aiming a gun out of his window at a building across the street:



69.    Cruz also posted the Arabic phrase "Allahu Akbar" on his Instagram.  Although the phrase simply means "God is great" is Arabic, the expression has been seized on by jihadists who claim that Islam justifies their attacks on innocent civilians in the name of God.  The FBI, of course, is aware that the phrase has often been used by jihad-inspired terrorists during and before attacks. For example, the driver of a truck that mowed down 20 people on a Manhattan bike path in

November 2017 cried out "Allahu akbar" before he was shot by a police officer.  The men who carried out the attack on the French newspaper Charlie Hebdo in 2015 shouted it during their onslaught.  And the phrase rang through the air as a British soldier was run down near military barracks in 2013 and then hacked to death.[10]  Cruz's post confirms yet another piece of information the January 5 caller gave the FBI—that Cruz had become fixated with ISIS and had been using social media to post Arabic phrases.  Cruz specifically posted the Arabic phrase used by terrorists inspired by or affiliated with ISIS during their attacks.

70.     In another post, Cruz showed a disturbing image of target practice with the caption: "Group Therapy. Sometimes it works.":



---

[10] https://www.nytimes.com/2017/11/02/world/americas/allahu-akbar-terrorism.html.

71.     Cruz also posted photographs of mutilated animals on his Instagram account.  For example, in one post, Cruz posted a disturbing photograph of a disemboweled frog surrounded by blood, saying he had killed it:



72.     In the months preceding the Parkland shooting, Cruz made several threatening comments under videos on YouTube and other sites.  They include:

- "I whana shoot people with my AR-15"

- "I wanna die Fighting killing s**t ton of people"

- "I am going to kill law enforcement one day they go after the good people"

73.     If the January 5 caller's information had been documented on Guardian and forwarded to the FBI Miami Field Office—as mandatory directives required—all of these pre-attack posts, and others, would have been monitored and utilized to prevent the attack that led to Plaintiff's injuries and damages.

**V.     "Hello. My name is Nick. And I'm going to be the next school shooter of 2018."**

74.     In the months after the FBI first received information about Cruz's intentions of becoming a school shooter, Cruz was using his cell phone to make his violent plans.  If the FBI

had taken investigative steps with the information it received about Cruz, it would have discovered a trove of information that demonstrated Cruz's plans to kill students and teachers at Marjory Stoneman Douglas High School.

75.     From November 2017 until the end of the year, Cruz was using his cell phone to search for examples of school shootings and other shooting massacres, including the Marshall County school shooting, the Columbine school shooting, and the Aurora movie theater shooting.

76.     On January 20, 2018—after the January 5 tip call—Cruz wrote a note to himself on his cellphone: "basketball court full of targets still thinking of ways to kill people."

77.     Twelve days before the shooting, on February 2, 2018, Cruz took a "screenshot" on his cellphone recording the school schedule at Marjory Stoneman Douglas High School.

78.     In the week before the shooting, Cruz viewed numerous videos discussing school shootings, including videos made by the Virginia Tech school shooter, Columbine dramas, and a school shooting simulator.

79.     Three days before the shooting, on February 11, 2018, Cruz shot a video on his cellphone.  In the video, Cruz said the following: "Hello. My name is Nick and I'm going to be the next school shooter of 2018.  My goal is at least 20 people with an AR-15…. Location is Stoneman Douglas in Parkland Florida.  It's going to be a big event.  When you see me in the news, you'll all know who I am.  You're all going to die."

## VI.     **The Shooting**

80.     On the afternoon of February 14, 2018, Marjory Stoneman Douglas students were anticipating the dismissal bell when, instead, they heard the sound of gunfire.

81.     At 2:21 p.m. Cruz entered Building 12 of the school after an Uber dropped him off at the school's entrance.

82.     Cruz removed his .223-caliber AR-15-style rifle from a soft black case he was carrying, went back into the first floor hallway, and shot three students walking together.  Then Cruz began to shoot into different classrooms and elsewhere in the first floor hallway.  Cruz killed eleven people and injuring thirteen on that first floor.  Cruz shot the Plaintiff while she was in a classroom on the first floor of Building 12.

83.     The smoke emitting from Cruz's rifle and/or the dust from the ceiling tiles which reverberated from the rifle fire activated the fire alarm, causing a vice principal in another building monitoring the alarm to repeatedly command on the Building 12's public address system that everyone in that building evacuate.  The alarm and evacuation commands ultimately drew some unsuspecting students and faculty members from their classrooms and into the line of fire.

84.     Cruz proceeded, through the school's west stairwell, up to the second floor, where he roamed across the halls, stopping to shoot into one classroom without injuring anyone inside.

85.     He then took the east stairwell up to the third floor of the school, where he continued shooting, ultimately murdering six other people, and injuring several others.

86.     After shooting several rounds through the window of the third-floor teachers' lounge onto fleeing students below, Cruz dropped his weapon and removed his ammunition vest so he could blend into the crowd of students running away.

87.     Cruz walked out of the Marjory Stoneman Douglas High School campus with the fleeing crowd of students, proceeded to a Walmart store to buy a drink, and then on to a nearby McDonald's.  Cruz then continued to roam freely until he was detained more than one hour after the shooting began in a Coral Springs neighborhood while walking down the street.

88.     After the massacre was over, authorities found that Cruz had etched swastikas onto the ammunition magazines he used during the shooting.  Besides the AR-15 Cruz used in the

shooting, Cruz owned six additional firearms: a Ruger .30-06 rifle, a Century Arms 7.62 AK-style rifle, a Remington 12 gauge shotgun, a Hi-Point 9x19 mm rifle, and two Mossberg 12 gauge shotguns. The shotguns had swastikas etched on the stock.

**VII.** **By at least January 2018, the FBI knew or should have known Nikolas Cruz would carry out a mass shooting at Marjory Stoneman Douglas High School, and it had the authority and the ability to prevent the massacre.**

89.     The FBI's own published manuals shed light on Cruz's potential risk and the investigative and preventative steps the FBI takes in response to threats of mass shootings, active shooters, school shootings, and terrorism threats. For example, in 2015, the FBI's Behavioral Analysis Unit studied ways to reduce mass shootings and other forms of targeted violence. It published the results of the study in a guidebook called "Making Prevention a Reality: Identifying, Assessing, and Managing the Threat of Targeted Attacks."

90.     The FBI's guidebook for preventing targeted attacks explains that "bystanders are a key component for prevention of targeted violence events." It defines a bystander as "anyone positioned to have awareness of risk factors or to observe warning behaviors related to a person who may be considering acting violently," including "a friend on social media, a classmate, a co-worker, a neighbor, a family member, or a casual observer." A bystander "can potentially intervene by various means, but most importantly by simply conveying what he knows, observes, or fears may happen." The FBI counsels that bystanders are "an absolutely critical component of prevention." In key research studies reviewed by the FBI, researchers found that "in 81% of school shooting cases they reviewed, the offender told at least one person about the attack beforehand" and in "59% of cases at least two other individuals had some information about the event before it was carried out." When bystanders report what they know to authorities, they "create opportunities for intervention and ultimately prevention."

91.     The FBI's guidebook explains that persons of concern are often identified when they make a threat—*i.e.*, an expression of intention to inflict injury or damage.  It explains that threats "must all be taken seriously and thoroughly evaluated."

92.     The FBI's guidebook also lists several "warning behaviors" that evidence an increasing and accelerating risk that someone will carry out a targeted attack.  The FBI notes that "[w]hen warning behaviors are evidenced, they require a threat management strategy and operational response.  They are, for the most part, proximal behaviors, occurring more closely in time to a potential act of targeted violence."

93.     The FBI defines a "pathway to violence warning behavior" as any behavior that is part of research, planning, preparation, or implementation of an attack.  Examples of pathway warning behaviors include "obtaining weapons and gear as well as familiarization with the weapons."

94.     The January 5 caller warned that Cruz had demonstrated "pathway to violence" warning behaviors, including a preoccupation with acquiring weapons and ammunition to carry out a violent attack.

95.     The FBI defines a "fixation warning behavior" as "an increasing preoccupation with a person or a cause."

96.     The January 5 caller warned the FBI that Nikolas Cruz had demonstrated fixation warning behaviors, including by telling the FBI that Cruz is "so into ISIS" and had posted messages in Arabic on social media that appeared to be related to the terrorist organization.  She also warned that Cruz had expressed a desire to kill people.

97.     The FBI defines an "identification warning behavior" as one that becomes evident when a person adopts a "pseudo-commando" identity.  "A preoccupation with firearms and a desire

to use them for revenge may be evident. . . . The practical aspect of identification warning behavior may feature an unusual fascination with weapons or other military or law enforcement paraphernalia.  This can be demonstrated through actual weapons, ammunition or paraphernalia purchases, or through virtual activities such as intense preoccupation with and practice on first-person shooter games, or in-depth on-line research of weapons.  A psychological aspect of identification may involve physical costuming, immersion in aggressive or violent materials, or fantasizing about offending violently."

98.     The January 5 caller warned the FBI that Nikolas Cruz had demonstrated identification warning behaviors.  On the call, the tipster noted that Cruz had an unusual fascination with guns and weapons, posting many photos on Instagram of guns he had purchased.  He had also posted "pictures of himself dressed up" as a member of ISIS and in military garb.

99.     The FBI defines "novel aggression warning behavior" as an act of violence in which the person is "testing" his ability to actually engage in a violent act, or experimental aggression. "Examples of acts of novel aggression could include animal cruelty, assault, firearm discharge, arson or bombing, rehearsed violence with inanimate objects fantasized to be human targets, or even vandalism."

100.    The January 5 tipster warned the FBI in January 2018 that Nikolas Cruz had demonstrated novel aggression warning behaviors including committing concerning acts of animal cruelty, assaulting his mother and school peers, and pulling a rifle on his mother in order to get money to buy more weapons.

101.    The FBI defines "leakage" as "a communication *to a third party* of intent to do harm to a target through an attack." The FBI advises that "[w]hen leakage in any form is discovered, it should be recognized as such and not dismissed as fantasy writing or mere venting .

. . A full consideration of all facts and circumstances will help threat managers discern the difference."

102.     In the months preceding the school shooting, two tipsters warned the FBI that Cruz had "leaked" his intent to kill other people and, specifically, to become a "professional school shooter."

103.     The FBI guidebook also describes the numerous methods of intervention well short of arrest to deal with a person of concern once a threat of a targeted attack is identified.  These management options include third-party monitoring, third-party intervention, direct interview, administrative actions, civil actions, criminal enforcement, setting specific boundaries and limits, 100% enforcement, mental health commitments, alternatives to violence counseling, outpatient mental health care, stress and anger management classes, and other types of services.

104.     In addition, "[w]hen a concern for violence rises above low," the FBI guidebook instructs threat management teams to do increased vigilance and target hardening.  In other words, the FBI suggests increasing security measures at the threat's likely target.  "Examples of increased vigilance may include increased awareness by personnel in and around the environment in question, training on and adherence to security procedures, identification verifications, information sharing, and law enforcement alerts. . . . Target hardening can involve a thorough security process review, reduction of access points to the facility, more visible security, parking lot security and escorts, flagging the address in the '911' system, and other measures deemed appropriate."

105.     The FBI defines a "low" level of concern scenario as one where, for example, the person of concern "may have evidenced few to no warning behaviors, he may "not have a significant number of risk factors," or "circumstances may make it nearly impossible for the

subject to carry out his threat (e.g., the person of concern is incarcerated, does not have a proxy willing to act violently on his behalf, and the target it outside the institution)."

106.    The FBI defines a "moderate" level of concern scenario as one where, for example, "others may be concerned about the person potentially acting out violently," the person "may have an increased number of risk factors (e.g., acting out violently, a paranoid personality disorder, substance abuse, or instability in employment and relationships)," and stressors may be present in the person's life that could move the person further toward violence.  In this scenario, the FBI advises that "monitoring and additional actions are necessary or desirable to further evaluate and respond to the situation to a point of resolution."

107.    The FBI defines an "elevated" level of concern scenario as one where, for example, a person of concern is making preparations such as "weapons acquisition and training that are both contextually inappropriate and an escalation from his norm," or "increasing warning behaviors may become more evident," or "stressors in a person's life appear to be escalating and his abilities to cope with them appear diminished," or "suicidal/homicidal ideation" is present.  In this scenario, the FBI explains that "the person of concern is reaching a critical point on a pathway to violence." To deal with the threat, "a threat management team and additional resources should focus on reducing his susceptibility to violence and the target's vulnerability, through guidance and enhanced security efforts."

108.    The FBI defines a "high" level of concern scenario as one where, for example, a person of concern "has exhibited highly concerning warning behaviors," the person "has the means and ability to carry out a violent attack," or the person exhibits a combination of serious mental illness, substance abuse or dependence, a history of violence or other risk factors. According to the FBI, "violence is possible and could occur within the near future following any precipitating

events. Immediate and continuing attention is required from threat management resources to ensure violence does not occur."

109.     The information communicated to the FBI on the January 5 call alerted the FBI that Cruz was exhibiting an elevated or high level of risk. The FBI was told about Cruz's young age and low mental skills, his mother's recent death, his communicating suicidal and homicidal ideation, his sympathizing with ISIS, his violent history, and his preoccupation with acquiring rifles, among other things.  These, along with Cruz's other warning behaviors and risk factors, should have alerted the FBI that Cruz was capable of committing violence in the near future.

110.     If the information provided by the January 5 caller had been shared with FBI agents—as mandatory directives required—the FBI agents would have recognized these warning behaviors, of course, as the FBI itself published the guidance describing them.  If FBI agents had the information they needed to intervene, they would have taken at least some of the measures described in the FBI's own guidance to prevent or mitigate Cruz's attack.

111.     In June 2018, the FBI published "A Study of the Pre-Attack Behaviors of Active Shooters in the United States between 2000 and 2013."  The study explains that "[i]n the weeks and months before an attack, many active shooters engage in behaviors that may signal impending violence.  While some of these behaviors are intentionally concealed, others are observable and—if recognized and reported—may lead to a disruption prior to an attack."

112.     The FBI explained that active shooters tend to be "individuals who fail to successfully navigate multiple stressors in their lives while concurrently displaying four to five observable, concerning behaviors, engaging in planning and preparation, and frequently communicating threats or leaking indications of an intent to attack.  As an active shooter progresses

on a trajectory toward violence, these observable behaviors may represent critical opportunities for detection and disruption."

113.    Prior to the attack, the FBI was aware that Cruz had displayed many of the observable concerning behaviors that precipitate a mass shooting.  The FBI study explains that shooters typically undergo multiple stressors in the year before an attack, which could include the death of a relative, mental health problems, school-related problems, and conflicts with parents.  The FBI also provides a list of concerning behaviors that are typically observed in active shooters before an attack.  The list includes observed instances of inappropriate anger, inappropriate firearms behavior, more than the usual amount of discord in ongoing relationships with family, communication to a third-party of the intent to harm another person, indications of mental health issues, physical aggression, and violent media usage.

114.    The January 5 caller warned the FBI that Cruz had experienced multiple triggering stressors and displayed observable concerning behavior in the months before the shooting.  The tipster told the FBI that Cruz's mother had died, he had expressed a desire to kill himself and others, he had been kicked out of school for engaging in violently aggressive behavior directed toward his peers, and he had pulled a rifle on his own mother before her death.  Cruz delighted in torturing and mutilating animals, and he posted gruesome pictures on social media.  He had communicated his violent inclinations publicly using social media, and the social media account information was specifically provided to the FBI on the January 5 call.

115.    The FBI was also aware, or reasonably should have foreseen, that Marjory Stoneman Douglas High School was Nikolas Cruz's likely target.  Cruz was 19 years old at the time of the shooting, and he had previously attended Marjory Stoneman Douglas High School.  The January 5 caller warned the FBI that Cruz would shoot up a school.  Months earlier, in October

2017, Cruz had expressed his desire to become a school shooter in a YouTube comment reported to the FBI.

116.     The FBI was also aware, or with reasonable diligence should have discovered, that Cruz had a history of acting violently at Marjory Stoneman Douglas High School.  The January 5 caller told the FBI that Cruz had thrown a chair at a student or teacher at his high school, and he had been kicked out of that school.  Cruz's history of violence at the school was well-documented and would have been easily discovered during a reasonable investigation into Cruz.

117.     In addition, the FBI knows that active shooters in Cruz's age group are very likely to choose their former school as a target.  In the FBI's study on pre-attack behaviors, the FBI explained that "active shooters often attacked people and places with which they were already familiar. There was a known connection between the active shooters and the attack site in the majority of cases . . . , often a workplace or former workplace for those 18 and older . . . , and almost always a school or former school for those younger than 18 . . . ."

## VIII.   The FBI's Admitted Failures

### A.     The FBI completely failed to document or otherwise react to the information provided by the January 2018 caller.

118.     As stated above, in response to the Bennight tip in September 2017, the FBI created a Guardian—*i.e.*, documentation which directly led to certain investigative steps being taken. Among other things, the Bennight Guardian classified the information relayed by Bennight as a "Type 1/Type 2" Assessment and a "Terrorist Threat."  These classifications automatically cause clear and unambiguous steps to be taken by the FBI to prevent harm.

119.     In stark contrast to the handling of the Bennight Tip, and in direct violation of clear mandatory guidance, the FBI failed to document the information it received from the January 5 caller.  No Guardian was prepared for this information, and no information was forwarded to the

Miami Field Office.  This was just one of many violations of the FBI's own mandatory directives. If the information had been properly documented and forwarded, in compliance with the FBI's own mandatory directives, appropriate investigative steps would have been taken and the attack at Marjory Stoneman Douglas High School would have been prevented.

120.    The consequences of the failure to document a Type 1/Type 2 Assessment are broad and serious; as a direct result, the government failed to take any of the other mandatory steps that were required in light of the nature of the specific information provided by the January 5 caller such as the FBI's responsibilities with respect to terrorism-related information and the requirement to notify persons and other law enforcement agencies of threats to life, among other things.

**B.     The FBI's February 16, 2018 Call to Frederic Guttenberg.**

121.    On February 16, just two days after the shooting, Frederic and Jennifer Guttenberg were sitting with their rabbi and a funeral director planning the funeral for their daughter Jaime Guttenberg.  Jaime was another of the innocent students who were shot and killed at MSD on Valentine's Day 2018.They were in the process of picking a casket for their daughter when Fred looked at his phone and saw that he had received a text message and a missed call from a representative for the FBI. The text message advised Fred that the FBI had important information to share with him. Fred asked the FBI agent to call him.

122.    During the call, the FBI agent told Fred that the FBI was at fault for failing to prevent the tragedy that took his daughter's life. The FBI agent said that the FBI's tragic mistakes were about to become public, and he wanted to make sure Fred heard it from the FBI first.

123.    The FBI representative told Fred that, before the shooting, the FBI had received information about the killer that should have been acted upon and was not. The FBI agent also admitted that, had the bureau acted upon the information it had received, the FBI would have been able to prevent Cruz from carrying out the shooting.

124.    Fred asked the FBI representative, "Are you telling me that if the FBI did not make a mistake and did their job a month sooner, my daughter would still be alive today?" To that, the FBI agent replied, "I'm afraid so, sir."

**C.    The February 16, 2018 FBI Statement on the Parkland Shooting.**

125.    On February 16, 2018, the FBI issued a statement admitting it had violated established protocols in responding to information it received about Cruz prior to the shooting.

126.    In the statement, the FBI stated that "[o]n January 5, 2018, a person close to Nikolas Cruz contacted the FBI's Public Access Line (PAL) tip-line to report concerns about him. The caller provided information about Cruz's gun ownership, desire to kill people, erratic behavior, and disturbing social media posts, as well as the potential of him conducting a school shooting."[11]

127.    The FBI admitted that "under established protocols, the information provided by the caller should have been assessed as a potential threat to life.  The information then should have been forwarded to the FBI Miami Field Office, where appropriate investigative steps would have been taken."

128.    The statement makes clear that the FBI was under a non-discretionary duty to assess the information about Cruz as a "potential threat to life."  This assessment would trigger a non-discretionary duty to forward information to the FBI Miami Field Office.  And, at that point, the FBI Miami Field Office would have had a non-discretionary duty to take appropriate investigative steps.

129.    FBI officials did not have discretion to do nothing.  Established protocols required the FBI to act in specific ways in response to the information it received about Cruz: assess the information as a potential threat to life and forward it to the FBI Miami Field Office.

---

[11]    https://www.fbi.gov/news/pressrel/press-releases/fbi-statement-on-the-shooting-in-parkland-florida.

130.   Further, FBI Miami Field Office personnel did not have discretion to do nothing. The FBI's statement explains that if the information had been forwarded to the FBI Miami Field Office, "appropriate investigative steps *would have been taken*."  The statement leaves no room for discretion on the part of the FBI Miami Field Office in deciding whether to take appropriate investigative steps.  An investigation was required under the FBI's own mandatory directives.

131.   Doing nothing in response to a tip regarding a potential threat to life is not an act embraced within the discretion granted to agents of the FBI.

132.   The FBI admitted in its statement that established protocols "were not followed for the information received by the PAL on January 5.  The information was not provided to the Miami Field Office, and no further investigation was conducted at that time."

133.   In other words, the FBI admitted that it violated established protocols, which governed its conduct in responding to the information it received about Cruz.

134.   Despite the FBI's awareness of Cruz's gun ownership, desire to kill people, erratic behavior, disturbing social media posts, and the potential of him conducting a school shooting, the bureau failed to follow established protocols that would have prevented the shooting from taking place.

135.   The FBI's failure to abide by established policies, procedures, protocols, and/or guidelines directly and proximately caused the horrific tragedy that caused the injuries and damages suffered by the Plaintiff.

**D.     The FBI's Press Conference on the Parkland Shooting.**

136.   On February 22, 2018, Bowdich held a press conference in which he admitted that "there was a mistake made."

137.    Bowdich stated that strong processes and protocols (*i.e.*, mandatory directives) were in place and further admitted that their purpose was to deal with and respond to tips, "it's just they were not followed."

**E.    The FBI's Congressional Testimony on the Parkland Shooting.**

138.    The FBI also admitted its negligent failures in sworn public testimony.

139.    Acting Deputy Director Bowdich testified about the Parkland shooting in hearings before the Senate and House Judiciary Committees on March 14 and 20, 2018.

140.    During his testimony, Bowdich, admitted that the FBI had received two separate tips alerting them to the dangers Nikolas Cruz posed and failed to respond to the tips properly.

141.    Bowdich admitted that the FBI "clearly should have done more" in response to these alerts. He then summarized the current results of their investigation into what the FBI failed to do to prevent this massacre. The findings were the following:

- On September 25, 2017, the FBI received an e-mail alerting them that somebody under the username "Nikolas Cruz" had posted a comment on YouTube that said "I'm going to be a professional school shooter."

- In response to this tip, the FBI opened a "Guardian" lead and assigned it to their Jackson Field Office in Mississippi. Representatives from that office visited and interviewed the tipster. They then determined that the identity of the commenter could not be ascertained and closed the investigation without any further follow-up or alert to local law enforcement agencies.

- On January 5, 2018, the FBI received a call-in tip from a woman who identified herself as a close friend of the Cruz family.

- This caller alerted the FBI to Cruz's statements about harming himself and others; his references to ISIS; previous threats he made against his mother with a rifle; that he had purchased several weapons and said he wanted to kill people; that he was mutilating small animals; and that he, at 18, had the mental capacity of a 12- to 14-year old.

- The caller told the FBI about the danger that Cruz would "shoot up a school."

- The FBI operator matched the information from this tip to the previous Guardian lead regarding the YouTube post. She "consulted with her supervisor and the matter was closed" without any further action. Information of this tip was never forwarded along for any further review and local law enforcement was, again, not informed of the tip.

142.    Once they were notified of the shooting at Marjory Stoneman Douglas, the FBI connected the shooter to the previously obtained tips.

143.    Bowdich concluded his testimony by stating that the FBI is "committed…to doing whatever is necessary to correct our mistakes and prevent tragedies like this one from being repeated."

**F.    Discipline for the PAL employees who violated established protocols.**

144.    The PAL employees involved in handling the information about Cruz were severely disciplined once their misconduct was discovered by the FBI.

145.    One of these personnel was fired because of the negligent failures—failures that arose from the commission of acts outside of the employee's discretion—which led to the Parkland shooting.  Another employee was demoted from his/her position within the FBI.

G.      **The FBI's December 8, 2018 meeting with the Parkland families.**

146.    Approximately ten months after the shooting—on December 8, 2018—numerous victims and victims' family members attended a meeting at the FBI's Miami Field Office in Miramar, Florida.

147.    Several FBI officials attended the meeting, including Bowdich and George Piro, Special Agent in charge of the Miami Field office.  Bowdich delivered a presentation from the FBI and addressed all questions presented by victims' families.

148.    Bowdich explained that the reason it had taken so long after the shooting to hold this meeting was that the FBI needed to take certain personnel actions before the agency could discuss the results of its review with loved ones of the Parkland shooting victims.

149.    Bowdich provided a history of the PAL call center West Virginia.  He stated that it was established in 2012 and that the idea behind the call center was to have tips that the FBI received from the public routed to the call center to standardize and consolidate the process of tip collection.

150.    Bowdich went on to describe two tips that the FBI received concerning Cruz.  The first tip was received on September 24, 2017. The caller ("Bennight") was from Mississippi and provided the PAL employee a screenshot of a video Cruz had posted to YouTube.

151.    The PAL employee concluded that the tip Bennight provided warranted follow up. As a result, a "Guardian" was prepared, and Bennight was subsequently interviewed by an FBI agent.  The agent and a detective who later handled the Guardian determined that they could not identify Cruz based on the information provided by the Mississippi caller.  However, these two officials did not contact YouTube for information about Cruz, nor did they issue a subpoena for more information.  FBI officials then closed the Guardian regarding the September 2017 call.

152.    Bowdich then described a second tip: a call received by the FBI from the January 2018 Caller.  The January 2018 Caller called in with concerns that Cruz posed an immediate threat to the lives of others.  The January 2018 Caller was clear that she expressly and specifically expected Cruz to kill people, and mentioned that he would shoot up a school.  She also informed the PAL representative that Cruz had guns and was infatuated with the terrorist group ISIS.

153.    The January 2018 Caller explained that given the threat posed by Cruz, her only options were to call either the FBI or the Department of Homeland Security.

154.    The PAL employee who spoke with the aunt referred the call to her supervisor.  The supervisor never listened to the call.

155.    Bowdich told the families that he had listened to the recording of the January 2018 Caller, and that his heart sank when he heard it.  He said he was "appalled" to hear the detailed information provided by the January 2018 caller.

156.    When asked about the FBI's protocols for handling tips received from the public, Bowdich said that PAL employees *were required* to respond in specific ways to any threat of terrorism.  For example, Bowdich explained that any reference to a terrorist organization—such as ISIS—*mandated* FBI follow-up and involvement.

157.    Bowdich told families that the call from the January 2018 Caller was explicit, that the threat was clear, and that, according to the FBI's own protocols the tip should have been referred to the Miami Field Office.

158.    Bowdich also admitted that at the time the tips were made (i) the PAL center did not have enough staff to handle the volume of calls it received; (ii) the training PAL employees received was inadequate; and (iii) the PAL was under-staffed.

159.     Bowdich finally admitted that the entire leadership team at the West Virginia PAL call center was being replaced, that the PAL employee who received the January 2018 call was no longer with the FBI, and that the employee's supervisor had received extensive discipline.

## CAUSE OF ACTION

## COUNT I: NEGLIGENCE

160.     Plaintiff incorporates by reference the allegations contained in all preceding paragraphs.

### Duty

161.     The FBI owed a legal duty to the students and teachers of Marjory Stoneman Douglas High School in Parkland, Florida.

162.     *First*, the FBI owed a duty of reasonable care toward the students and teachers of Marjory Stoneman Douglas High School under the "voluntary undertaking" or "Good Samaritan" doctrine, pursuant to Florida common law and the Restatement (Second) of Torts §§ 324A(a) and 324A(c).

163.     The FBI undertook to serve as the receiver, repository, and conduit of information regarding potential threats to life, active shooters, mass shootings, terrorism threats, and school shootings.  In response to the FBI's undertaking, the public relied on the FBI as the exclusive receiver, repository, and conduit of information concerning these threats, even to the exclusion of other governmental entities that could have handled the information.  The individuals who contacted FBI with information about Cruz did, in fact, rely on the FBI to exercise reasonable care in its undertaking to process the information and pass it along to the FBI employees or other law enforcement agencies who would have taken additional investigative steps.  Indeed, the FBI induced reliance through its public outreach efforts and in its communications with the individuals who provided the FBI information about Cruz.

164.    The FBI's failure to exercise reasonable care in its undertaking increased the risk of harm to the students and teachers at Marjory Stoneman Douglas High School. Had the FBI exercised reasonable care, the harms suffered by these victims would have been prevented, reduced, or made less likely.  Moreover, by assuring the public that tips would be handled with reasonable care and properly investigated—and expressly and specifically making such assurances to the January 5 caller—the FBI made it less likely that the caller would take other steps to mitigate the threat posed by Cruz, including but not limited to seeking the assistance, investigation, and intervention by other law  enforcement entities.

165.    The harm to the students and teachers at Marjory Stoneman Douglas High School was suffered because the January 5 caller relied on the FBI's undertaking.  Specifically, Plaintiff alleges:

    a.  The January 5 caller relied on the FBI's undertaking by, for example, foregoing other protective actions, remedies, and precautions against harm.  After her call with the FBI on January 5, the caller did not notify other authorities about the risks Cruz posed, she did not notify Marjory Stoneman Douglas High School of the risks, and she did not take other actions to intervene in Cruz's plans;

    b.  The January 5 caller would have alerted other authorities and taken other protective actions were it not for the FBI's undertaking;

    c.  The January 5 caller forewent other precautions on the belief that the FBI would (a) follow its own mandatory directives to vet and process the information; (b) exercise reasonable care in its handling of the information she provided the FBI about Nikolas Cruz; (c) pass the information along to an agent with the authority and expertise to look into the information she provided; and (d) investigate the information she provided the FBI;

    d.  The January 5 caller relied on the FBI to pass the information along to individuals within the FBI who would take investigative steps;

    e.  The January 5 caller relied on the FBI to exercise reasonable care in processing, vetting, documenting, and disseminating the information it received;

f.  The January 5 caller relied on the FBI to follow its own mandatory directives to ensure that the information was appropriately regarded as a potential threat to life and processed according to that designation;

g.  The January 5 caller relied on the FBI as the exclusive forum for reporting school shooting threats (and threats about potential threats to life, active shooters, mass shootings, and terrorism threats) because the FBI had undertaken to announce it was the appropriate entity to investigate the sorts of crimes that Cruz threatened to carry out;

h.  The January 5 caller was justified in her reliance on the FBI's undertaking given its affirmative efforts to induce the public to rely on it to serve as the repository and conduit of information about threats to life, school shootings, mass shootings, and terrorism threats;

i.  The January 5 caller was justified in her reliance on the FBI's undertaking because, when she sought assurances from the FBI's customer service representative that the FBI was the proper forum for reporting information about Cruz, the FBI reassured her, both implicitly and expressly, that the FBI was the proper forum for reporting such information, that the FBI would investigate the matter, and that the FBI would follow-up with the caller as the investigation proceeded;

j.  Given the tipster's reliance on the FBI and its assurances, the bureau's failure to exercise reasonable care in the handling and relaying of the information concerning a potential school shooting by Cruz created a broad zone of risk that such information would never be disseminated to an appropriate governmental body and that the tip would never be investigated and acted upon; and

k.  Such failure posed a general threat of harm to the students and staff at Marjory Stoneman Douglas High School—Cruz's foreseeable target and the intended beneficiaries of the tip, to whom the FBI ultimately owed a duty to perform its undertaking in a reasonable manner.

166.  As a result of the FBI's undertaking and the tipsters' justifiable reliance, the FBI knew or reasonably should have foreseen that the failure to exercise reasonable care in handling and relaying credible information it received concerning the threats Cruz posed created a broad zone of risk that encompassed the students and teachers at Marjory Stoneman Douglas High School.  The students and teachers at Marjory Stoneman Douglas High School were the foreseeable third-party beneficiaries of the FBI's services.  Both tips the FBI received—in

September 2017 and January 2018—alerted the FBI that Cruz intended to shoot up a school.  The January 5 caller told the FBI that Cruz had gotten expelled from high school; the high school Cruz was expelled from was Marjory Stoneman Douglas High School.  The FBI was aware that Cruz still lived in Parkland, Florida—the town where Marjory Stoneman Douglas High School is located.

167.    The FBI knew or should have known that its failure to exercise reasonable care in its undertaking would mean that the credible information of an imminent threat would never be disseminated to an appropriate governmental body and that such information would never be investigated and acted upon.

168.    If the FBI had not performed its undertaking negligently, the FBI admits that the information would have assessed as a potential threat to life and forwarded to the FBI Miami Field Office where additional investigative steps would have been taken.  Plaintiff alleges, and the FBI admits, that additional investigative steps would have occurred if the information had been handled according to the FBI's mandatory directives.  The information about Cruz would have reached the FBI agents who had the authority, experience, and expertise to investigate the information and prevent an attack.

169.    The FBI employees who acted negligently are liable to the same extent as private persons in like circumstances.  Plaintiff alleges the employees owe the same duty of care applicable to the private persons in the analogous situations listed below, among others:

a.   A private person who undertakes to warn the public of danger and thereby induces reliance must perform his good Samaritan task in a careful manner;

b.   Having voluntarily undertaken to maintain streetlights, an electric utility company owed the public a duty to use reasonable care in performing maintenance;

c.  Having voluntarily undertaken to maintain a lighthouse, the government owed a duty of care to all seafarers injured as a result of the negligent operation of the lighthouse;

d.  Having voluntarily undertaken to provide firefighting services, the government owed a duty of care to private landowners who could be foreseeably harmed by the government's failure to exercise reasonable care in its firefighting;

e.  Having voluntarily undertaken to conduct safety inspections, inspector owed a duty of care to conduct the inspection carefully;

f.  Sheriff owed common-law duty of care pursuant to undertaker's doctrine to individual who died several days after sheriffs performed safety check in response to neighbor's 911 call; the neighbor relied on the sheriffs to prevent harm and forewent other safety precautions such as summoning an ambulance;

g.  A retirement home, having undertaken to supervise a resident who it believed to be dangerous behind the wheel of a car, owed duty of care to roofer on the premises who was injured by retiree's negligent driving;

h.  Physicians owe a duty of care to third persons outside of the physician-patient relationship in instances where the physician undertakes the treatment of a patient with a communicable or contagious disease; the duty encompasses a duty to correctly inform the patient about the contagious nature of the disease in order to prevent spread to those who are within the foreseeable zone of harm;

i.  Mental health professionals owe a duty of care to third persons outside of the therapist-patient relationship, which encompasses a duty to warn, in instances where patient communicates intent to harm third person;

j.  If a private company, while having no affirmative duty to assist in firefighting, undertakes to render fire protection services to airport users, it is liable for the negligent discharge of the undertaking;

k.  Where the parents of a teenager who had been having emotional problems called the sheriff's office to transport their son to a mental health facility for treatment, sheriff owed duty of care to protect teenager from self-inflicted injuries;

l.  Where university undertook to run a residential rehabilitation program that accepted children with severe behavior problems and failed to take security measures to prevent children from running away, university owed duty of reasonable care toward those injured by runaway children because, having undertaken to rehabilitate children with behavior problems, the university had a duty to exercise reasonable care in carrying out its efforts;

m.  Police owed common law duty of care, under the voluntary undertaking doctrine, to hiker where officers assured third party that they would check into safety of hiker, thereby discouraging third party from taking action, leading to the hiker's death.

170.  The FBI undertook the task of handling and relaying the information it received from the January 5 caller in a reasonable manner. In light of the way the FBI held itself out to the public, its undertaking, and the context and content of the January 5 caller's communication with the FBI, the FBI knew or reasonably should have foreseen that:

a.  The January 5 caller relied on the FBI as the exclusive forum for reporting school shootings because, in response to the tipster's expressed ambivalence about whether the FBI was the proper forum for reporting information about Nikolas Cruz, the FBI reassured the tipster, both implicitly and expressly, that the FBI was the proper forum for reporting such information, that the FBI would investigate the matter, and that the FBI would follow-up with the tipster; and

b.  Given the tipster's reliance on the FBI and its assurances, failure to exercise reasonable care in the handling and relaying of the information concerning a potential school shooting by Nikolas Cruz created a broad zone of risk that such information would never be disseminated to an appropriate governmental body and that the tip would never be investigated and acted upon; and

c.  Such failure posed a general threat of harm to the students and staff at Marjory Stoneman Douglas High School—the foreseeable target of Nikolas Cruz and the intended beneficiaries of the tip, to whom the FBI ultimately owed a duty to perform its undertaking in a reasonable manner.

171.  **_Second_**, the FBI owed the students and teachers of Marjory Stoneman Douglas High School a duty of reasonable care because they were within the foreseeable zone of risk. The FBI knew or reasonably should have known that Cruz posed a threat to these students and teachers, and that failing to properly assess, investigate, neutralize, mitigate, or warn about the threat would cause, contribute to or increase an unreasonable risk of harm to them.  The FBI also specifically foresaw or reasonably should have foreseen that holding itself out as properly handling, assessing, and investigating tips from the public, and failing to do so in the case of Cruz, would cause, contribute to or increase an unreasonable risk of harm to the students and teachers.

172.    The students and teachers at Marjory Stoneman Douglas High School were in the foreseeable zone of risk.  The FBI knew or should have known that Marjory Stoneman Douglas High School was Cruz's target.  The FBI knew that Cruz intended to carry out a school shooting, that Cruz had amassed an arsenal of weapons in order to carry out his deadly intentions.  Both tips the FBI received—in September 2017 and January 2018—alerted the FBI that Cruz intended to shoot up a school.  The January 5 caller told the FBI that Cruz had gotten expelled from high school; the high school Cruz was expelled from was Marjory Stoneman Douglas High School.  The FBI was aware that Cruz still lived in Parkland, Florida—the town where Marjory Stoneman Douglas High School is located.

173.    **Third**, FBI owed the students and teachers of Marjory Stoneman Douglas High School in Parkland, Florida, a duty to comply with mandatory directives governing how information on school shootings, mass shootings, terrorism threats, and potential threats to life was to be handled.  FBI personnel were subject to mandatory, non-discretionary directives that dictated how tips concerning these potential threats had to be handled. The FBI had adopted those procedures as the standard of conduct for handling information concerning potential school shootings.  The FBI knew or reasonably should have foreseen that the failure to properly follow those mandatory directives upon receiving credible information concerning Cruz—including, among other things, his stated desire to commit a mass shooting at a school, his possession of high-powered weapons with which to carry out a school shooting, his disciplinary history as a student at Marjory Stoneman Douglas High School, and his propensity for violence—created a broad zone of risk that posed a general threat of harm to the students and staff at Marjory Stoneman Douglas High School, the foreseeable target of Nikolas Cruz.

174.   ***Fourth,*** The FBI owed the students and teachers of Marjory Stoneman Douglas High School in Parkland, Florida, a special duty to intervene because:

    a.   The FBI instructed the public to communicate information regarding potential school shootings, thereby willingly injecting itself into matters involving potential school shootings;

    b.   The FBI directly involved itself in handling the tip concerning Cruz by fielding the January 5 caller's tip and assuring the caller that the FBI would investigate the matter and that calling the FBI was the appropriate course of action, to the exclusion of notifying other law enforcement authorities;

    c.   The January 5 caller was, in fact, assured that the FBI would investigate the matter and act upon the information it was given to prevent an attack of the sort Cruz carried out;

    d.   The January 5 caller did, in fact, rely upon on the FBI to investigate the matter and act upon the information it was given to prevent an attack of the sort Cruz carried out;

    e.   The January 5 caller did, in fact, forego other precautionary measures and preventive actions in reliance on the FBI's non-negligent investigation and handling of the matter;

    f.   The FBI knew or reasonably could have foreseen that an identifiable group of individuals—here, students and teachers of Marjory Stoneman Douglas High School in Parkland, Florida—were the expected targets of Nikolas Cruz's violence or anticipated shootings; and

    g.   Despite knowing or reasonably foreseeing the risk to the students and teachers of Marjory Stoneman Douglas High School in Parkland, Florida, the FBI permitted the danger to exist by failing to act entirely, in violation of mandatory, established protocols.

**<u>Breach</u>**

175.   The FBI failed to exercise reasonable care (a) in failing to comply with mandatory directives that the bureau had adopted as the standard of conduct for handling information concerning potential school shootings; (b) in failing to comply with non-discretionary duties not to falsely assure people possessing credible information and evidence about anticipated school shootings that their tips and information would be taken seriously and investigated, and not to

dissuade people with such information from contacting other law enforcement agencies (c) in performing the task it undertook—serving as the receiver, repository, and conduit of information regarding school shootings—and upon which the public—and, specifically, the January 5 tipster— relied to their detriment; and (d) in the way it handled the information received concerning Nikolas Cruz and Marjory Stoneman Douglas High School, an entity that was foreseeably at risk of being attacked by Nikolas Cruz. Specifically, the FBI failed to exercise reasonable care in the following ways, among others:

   a. Doing nothing whatsoever with the information that it received concerning Cruz;

   b. Failing to assess, investigate, follow-up or conduct due diligence on the credible information it received from the public, including the January 5 caller;

   c. Failing to follow mandatory directives that required the FBI to forward the information it had received concerning Cruz to its Miami Field Office, which would have had a non-discretionary obligation to take investigative steps;

   d. Failing to adhere to protocols that it had adopted as standards of conduct concerning the handling of tips received from the public;

   e. Failing to intervene, including in any of a number of ways that the FBI has previously identified as effective intervention methods for preventing, mitigating, or reducing the likelihood of potential school shootings; and

   f. At the very least, failing to relay the information received from the January 5 caller to another governmental body that could have handled the investigation, or to Marjory Stoneman Douglas High School, Cruz's foreseeable likely target.

**Causation**

176.    As a direct and proximate cause of the FBI's negligence, Plaintiff was shot by Cruz. But for the FBI's negligence, Cruz would not have shot and injured the Plaintiff. The FBI's breaches of its duties of care—including its failure to investigate the tips and information it had received, failure to forward the information concerning Nikolas Cruz to appropriate governmental

bodies, and failure to follow the mandatory directives—were direct and substantial causes of the Plaintiff's loss.

177. The PAL's failure to document and forward information about Cruz to the FBI Miami Field Office prevented the information from reaching the hands of FBI agents with the experience and expertise to prevent or mitigate the attack that resulted in the injuries and damages suffered by the Plaintiff.

178. If the FBI agents at the FBI Miami Field Office had received the information about Cruz, they would have taken appropriate investigative steps with that information, as the FBI itself admits. Two days after the shooting, the FBI issued a public statement admitting that if the information about Cruz had been forwarded to the Miami Field Office "appropriate investigative steps would have been taken."

179. It is unreasonable to assume that agents of FBI—trained and experienced professionals employed by the entity of the United States government tasked with keeping the American people safe from precisely the sort of attack Cruz carried out—would not have been likely to succeed in preventing the attack on Marjory Stoneman Douglas High School. But, because of FBI employees' failures to follow mandatory directives, the FBI agents who were trained and qualified to protect the students and teachers at Marjory Stoneman Douglas High School were not given the information they needed to act.

180. If the FBI agents at the FBI Miami Field Office had taken appropriate investigative steps with the information about Cruz, they would have prevented the attacks that resulted in the injuries and damages suffered by the Plaintiff. Specifically, Plaintiff alleges:

   a. When agents in the FBI Miami Field Office receive information of the sort the PAL collected on Cruz, FBI agents act upon that information by taking appropriate investigative steps;

b. "Appropriate investigative steps" are actions that were likely—certainly more likely than not—to prevent or mitigate an attack like the one Cruz carried out;

c. FBI agents at the FBI Miami Field Office would have taken certain investigative steps with the information about Nikolas Cruz;

d. FBI agents at the FBI Miami Field Office are experienced professionals who have the expertise and ability to prevent terrorist attacks, mass shootings, and school shootings like the one that resulted in the injuries and damages suffered by the Plaintiff;

e. When FBI agents at the Miami Field Office have information about a threat to life that is serious and urgent, they consistently take appropriate action to mitigate, thwart, or neutralize the threat;

f. FBI agents at the FBI Miami Field Office are capable of thwarting, preventing, mitigating, and reducing the likelihood of threats to life by, among other things, taking steps to investigate such threats;

g. FBI agents at the FBI Miami Field Office routinely thwart potential threats to life by taking investigative steps;

h. Because the prevention of terrorist attacks is the FBI's number one investigative priority, information of the sort the FBI received about Cruz would have been thoroughly investigated by trained FBI agents;

i. If FBI agents at the FBI Miami Field Office had been given the information about Cruz, it would have acted upon the information promptly, and it certainly would not have ignored the information altogether.

181.    Indeed, when the FBI admitted in the aforesaid conversation with Fred Guttenberg two days after the shooting that the Guttenbergs' daughter would not have perished in Cruz's attack if the FBI had complied with its own mandatory directives, the FBI was in effect admitting that no one would have perished or been injured if the FBI had complied with its own mandatory directives, because the massacre would have been prevented.

182.    FBI agents in the FBI Miami Field Office would have had numerous options to investigate and prevent the attack that resulted in the injuries and damages suffered by the Plaintiff, including, but not limited to, directly interviewing Cruz; surveillance of Cruz; searching Cruz's

home where they would have found a cache of guns and ammunition, some of which had swastikas etched onto them; having Cruz committed to a mental health institution; arresting Cruz; search and seizure of Cruz's weapons; search and seizure of Cruz's cellphone, where the FBI would have discovered Cruz's escalation of his violent plans; coordination with local law enforcement; enlisting third-party monitors; and increased vigilance and target hardening activities, including warning Marjory Stoneman Douglas High School of a potential for an attack and taking security precautions to protect the students and teachers at the school.  Any one of these measures would have prevented the injuries and damages suffered by the Plaintiff.

**Damages**

183.    As a direct and proximate cause of the FBI's negligence, Plaintiff suffered harm, including without limitation, bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical, nursing care and treatment, loss of earnings and loss of ability to earn money.  The losses are either permanent or continuing in nature and Plaintiff will suffer the losses in the future.

184.    WHEREFORE, the Plaintiff demands judgment against the United States for compensatory damages, costs, and such other relief as this Court deems just and proper.

Respectfully submitted,

**BRILL & RINALDI, The Law Firm**
17150 Royal Palm Blvd., Suite 2
Weston, FL 33326
Telephone No.: (954) 876-4344
Facsimile No.: (954) 384-6226

/s/ *David W. Brill*
**David W. Brill, Esq.**
Florida Bar No. 0959560
Primary e-mail: david@brillrinaldi.com
Secondary e-mail: angely@brillrinaldi.com

**Joseph J. Rinaldi, Jr., Esq.**
Florida Bar No. 0581941
Primary e-mail: joe@brillrinaldi.com
Secondary e-mail: angely@brillrinaldi.com
**Zackary D. Slankard**
Florida Bar No. 1015939
Primary e-mail: zackary@brillrinaldi.com
Secondary e-mail: angely@brillrinaldi.com

♦ AND ♦

**Joel S. Perwin, P.A.**
1680 Michigan Avenue
Suite 700
Miami, FL 33139
Telephone: (305) 779-6090
Facsimile: (305) 779-6095
**Joel S. Perwin, Esq.**
Florida Bar No.: 316814
Primary e-mail: jperwin@perwinlaw.com
Secondary e-mail: sbigelow@perwinlaw.com